We'll wait for counsel to get settled. Good morning. Okay, Mr. Brissenden. Matthew Brissenden for the appellant. Thank you, Your Honor. Given my limited time, I wanted to focus in particular this morning on two of the issues I raised, namely the Solano instructional issue and the Nippu issue. And I'd like to start, if I could, with the Nippu violation. So in a typical situation where a defendant alleges that a prosecution witness has perjured himself at trial, the underlying, the perjury relates to the underlying facts of the case, right? Was this witness really present at a meeting of co-conspirators? What did the defendant say at that meeting? And it's extremely difficult under those circumstances to demonstrate that the government has knowingly adduced or permitted perjured testimony for the simple reason is none of us were there, right? The prosecutor doesn't have firsthand information about what was said at the meeting, nor does defense counsel. This situation is different because the subject matter of the perjury was uniquely within the knowledge and the purview of the government. It related to a material prior inconsistent statement that the witness had made to their own agent. Their own agent was sitting at the trial table as the witness is up there testifying, confronted with the notes of his statement and flagrantly denying that he ever made such a material inconsistent statement. The government doesn't say timeout. That's not our recollection. That's not our understanding of what this witness said. And even worse, when it comes to rebuttal summation, the government effectively endorses. There are often differences between a witness's testimony and what's in the FBI 302. Does that mean that every inconsistency becomes perjured? This situation, I think, is unique given sort of the granular and extensive detail that is in these notes. We're talking about a page and a half of notes that are describing very specific meetings that the witness indicates that he was present at, at specific times, at specific locations, particular restaurants. So this isn't a situation where there's a small detail that we're— There are inconsistencies, but does that mean it's perjury? Glaring inconsistencies to the point where either the statement was made or it wasn't. It's impossible to conclude that this witness did not testify inconsistently with what is reflected in those notes. It's not a minor quibbling detail. It's a massive deviation, and of course it's a deviation— Wasn't this pointed out to the jury? The argument was made in summation. So if, for instance, the government had acknowledged the accuracy of its own notes, perhaps we'd be in that situation, right? We'd say we put the facts in front of the jury. They can make what they will of it. I think the real compounding problem comes here in rebuttal summation when the prosecutor stands up and tells the jury that its own notes, its own 3500 material, is effectively meaningless. It sounds like a concession almost by the prosecution that there was an inconsistency. Well, to the contrary. What the prosecutor tells the jury is that they cannot conclude that there was any inconsistent statement, that their notes are meaningless. She suggests that they could be the internal musings or reflections of the agent, which is— What if the government, in fact, concludes that that's what it is? What if the government does not believe that the notes are reliable? I think there's a certain level of— But they're not allowed to make that conclusion. I would urge the court to look at these notes. I don't know how the agent would possibly— You're talking about the notes on pages 11 and 12 of your opening brief, right? Yes, Your Honor, and the full handwritten notes are included within the appendix. So assume that the agent is recording the conversation correctly and the witness is either mistaken or lying. The alleged fraud is that this witness and other victims were told that they were investing money for real estate development in Hawaii and that those monies were then diverted to this project in Mexico. The moment that matters for measuring whether somebody was defrauded or not is what they were told before they invested the money. And there's nothing— These notes say that there was another time at Symbol, a bar in NYC, where they discussed lending money from Hawaii to Mexico. So two things. One, that may be happening after this money has already been invested and there's nothing the alleged victim can do. And two, how do you know that he's being told that it's his money invested in the Hawaii project that's being diverted to Mexico instead of other money, maybe Lehman Brothers money or some other third party that's being diverted from one to the other? So what's significant about the notes is they actually include the date of the meeting. A restaurant called Trust was a restaurant owned by this jowdy individual in 2003. And so those loans don't actually come to fruition until sometime after 2003. No, the 2003 part, all it says is discuss project in Hawaii, funding in Mexico. The place where the notes get more specific about lending money from Hawaii to Mexico is after the heading, another time at a bar in NYC, date unknown. No?  I think it says JK, right, John Kaiser met jowdy two times in New York City, New York City. Right. At Trust, 2003, jowdy restaurant. Discuss project in Hawaii, funding in Mexico. And then it goes on to talk about additional meetings which took place after that. And what's significant is that when this witness took the stand, he denied ever discussing these loans with jowdy. What he testified is the only way that he knew about it. So what difference would it have made? The trial judge said there was overwhelming evidence of guilt. And, indeed, there appears to be overwhelming evidence of guilt. Accorded phone calls, e-mails, documents, texts. So I'd like to say two things, Your Honor. Number one, this court said that if the government knowingly permits perjured testimony, reversal should be virtually automatic. If there is any, any reasonable likelihood that the false testimony could have affected the judgment of the jury. And in this case, Mr. Kaiser's testimony touched on every single aspect of the alleged fraud. He was central to testifying about the Hawaiian deal. He was Mr. Kenner's partner in that deal. He was central to testifying about the Mexican loans. It was Mr. Kaiser who justified that the Constantine consulting agreement was a forgery. It was Kaiser who justified about the Ledbetter transaction. Was there any attempt to call Mr. Romanesky or Galeotto or someone who was present for the note-taking to explain what the notes were about? So the indication in the record is that defense counsel was initially considering calling the witness. There was a discussion that it might be more efficient to simply introduce notes, and it appears that's what happened. The notes are basically stipulated into evidence, apparently in an effort to speed things up. In defense counsel's defense, I can't imagine that he expected the government in rebuttal summation, the last thing the jury is going to hear, to stand up and essentially disclaim ownership of those notes and claim that they're not accurate. So you obviously wanted the government not to say what it said in rebuttal. Is there anything else you're arguing the government should have done? Are you saying they should have gotten up and stipulated after cross that we agree the notes are accurate or something? Listen, I think if there had been a stipulation as to the accuracy of the notes, that would have solved the problem. But even perhaps if the government had simply said nothing about the notes, I don't think I'd be standing here today making this argument. I think what is so troubling is when you have the government standing up and essentially endorsing this witness's perjury. That's what troubles me. I do want to say, you know, as far as there were these separate U4 accounts that Mr. Kenner is convicted on. Every single one of the accounts that he's convicted on relate to a wire that he sent to Mr. Kaiser. So again, Kaiser is central to that part of the case. He's central to the global settlement fund part because it's Mr. Kaiser who testifies about this purported Mexican tequila company. So he is a, if not the linchpin, a linchpin of the government's case. And, you know, underwhelmed again in the situation where there's evidence that the government knew or should have known he was perjuring himself on this material issue. Again, this is very similar to Napoo and Giglio, right? Again, the reason those cases are so clear cut is because a witness gets up there and he perjures himself about something that is uniquely in the government's purview. In those cases, it's about whether or not that witness had an agreement with the government, an understanding with the government. And in this case, it's about a prior material and consistent statement that the witness made to the government. This isn't about the underlying evidence. But you're saying everything we need to know to conclude that Mr. Kaiser's testimony was perjurious appears on the face of the notes themselves. That you just look at the notes and it's obvious that his testimony was a lie. And the notes were admitted, right? They were admitted and except, you know, when you have the government stand up and rebuttal. And, of course, the government's word carries a lot of weight with the jury. And the government tells them these are our notes. You can't trust them. They're meaningless. Don't rely on these notes. They don't say what they obviously say. That's troubling. That's troubling. And I do want to say I know my time is already over my time. It's especially problematic, I think, when you take it together with the other errors that occurred here. The Solano instructional error. The instruction that was provided here is identical to the instruction that this court found to be plain error in Solano. Can I ask a question about the restitution? You say in your brief that, you know, the cases where the restitution is the whole amount of the investment or the gross amount are cases where there's fraudulent inducements. But, of course, the indictment here did say that your client engaged in a scheme to fraudulently induce investors into investing a lot of money. So why isn't this a fraudulent inducement case? I think there's two parts of this case. There is the Euphoria section, and there's the Hawaiian loan section. I think viewed in the light most favorable to the government, you could make the argument that the Euphoria situation was fraudulent inducement. But I don't think you can make that argument with respect to the Hawaiian portion of the indictment. These individuals, these victims were longstanding investors with Mr. Kenner. They were enthusiastic about entering into the Hawaiian land deal. And the problem only arose years later when it's alleged that Mr. Kenner starts using the funds that they had designated for this particular purpose for other purposes. So this is not a fraudulent inducement, at least with respect to the $10 million Hawaiian portion of it. It's not a fraudulent inducement case. Okay. Thank you very much.  Mr. Presinden, you've reserved time for rebuttals, so we'll hear from you again. But let's hear from the government. Mr. Higgins. Thank you, Your Honors. Good morning. Matthew Higgins of the United States. I'll start right with the issue that defense counsel spent most of his time on in relation to the testimony of Mr. Kaiser. Mr. Kaiser was one of more than three dozen government witnesses who testified over the course of an eight- or nine-week trial. I think the transcript runs to some 6,000 pages. And Mr. Kaiser's testimony was one verse of a very consistent hymn from the investor or clients of Mr. Kenner, that Mr. Kenner had induced them to enter into these Hawaiian investments, had misrepresented what was going to happen with their lines of credit attached to that investment if, indeed, they were advised of that at all. And then when the losses began to mount, he misrepresented what was happening with the funds, as well as using one investor's line of credit to pay off another line of investor's credit. And so that's the context, I think, in which the Court should consider the importance of Mr. Kaiser's testimony. It was consistent with the testimony of many of the other investor victims in this case, and those are summarized very succinctly. I'll just point out whether he had met Joudy before. Is there any way to read these notes as saying that this is consistent with the idea that he did not? That he had met Mr. Joudy? That he had not met Mr. Joudy. Didn't he testify that he was not aware of the loan at all, had never discussed it, had not met Joudy? I believe he testified when initially confronted with the notes, there are matters in here that are consistent with what I remember, and there are matters in here that are not consistent with what I remember. What was the consistent part, that they did meet? I believe they did meet, yes, Your Honor. That's correct. And this interview by Mr. Romanowski from a different office is being conducted by telephone. The notes then ultimately come into evidence, so I think as the Court has already defined, when the jury is presented with the testimony of Mr. Kaiser, the testimony of Mr. Kenner on many of these same points, and the notes themselves, the jury has all the information it needs to conclude who's telling the truth and who's not telling the truth. And I think as Judge Chin has correctly noted, we have many cases in which government witnesses testify and are impeached by prior inconsistent statements. It's a rare case in which the underlying notes are actually admitted into evidence. And so for the appellant to complain now that not only there's a cold, hard record that perjurious testimony was introduced, much less that it was suborned by the government, it's a high hurdle to clear, and I don't think the papers clear it. And so your view is that you just think that the notes were in error to the extent they're inconsistent with the testimony? They could have been in error. They could have been mistaken. They could have been misunderstood. As I noted, I believe it is in the record that the interview was conducted via telephone. I've conducted interviews via telephone. I'd always prefer to be in the room with the witness conducting the interview. But at the end of the day, everything is presented to the jury to make a determination. And when they've got a list of investor victim witnesses essentially telling the same version of events in terms of their relationship with Mr. Kenner in the critical period versus just Mr. Kenner's explanation for some of these events. And I'd like to push back a little bit on counsel's conclusion about Mr. Kaiser's centrality to the course of events here. That's largely a version of events that comes from Mr. Kenner's testimony. And some of Mr. Kenner's testimony on those points I would submit to the court is just patently ridiculous. So, for example. Judge Bianco found it galling, I think is the word. I don't know if it was the exact word, but certainly that's the spirit of it, Your Honor. For one example, he claimed that he did not have any documentation of his advice to his clients that their Hawaii funds were being loaned to Mr. Jowdy for purposes of this Mexico investment. Because, quote, he did not have a text message or an email relationship with his clients. This is in the mid-2000s, the first decade of the 21st century. In relation to the purported loan agreement with Mr. Jowdy, Mr. Kenner conceded that he did not maintain a copy. This loan agreement that supposedly validated some $5 million in investor funds, he said, I didn't think about maintaining a copy of that. It is, just to return to Judge Menasche's question, it's a bit confounding to understand how these notes come out this way in light of the ultimate testimony of the witness. The notes reflect the witness saying over and over again that K.J. wanted to borrow money from Hawaii to Mexico, would pay back after closing. K.J. brought up borrowing money from Hawaii Project. And then they summarize at the end that what J.K. is not happy about is that it was more money than he expected. He expected hundreds of thousands of dollars to be loaned from Hawaii to Mexico, but it grew to millions. How is that, it's quite a hallucination if the witness is correct, right? Unless maybe the FBI agent or whoever the agent is has conflated one witness with another, and this is a case of mistaken identity. I mean, how else do you, what are we supposed to take away from this on the underlying facts? Even if the court were to conclude that the jury could or should have credited the notes in derogation of Mr. Kaiser's testimony, that would not unseat the verdict in this case, Your Honor, because of the testimony of all of the other investor victims who said, we didn't approve this expenditure. But would it necessarily imply perjury? Or is there some other explanation? I think there are many other explanations short of perjury, Your Honor, mistaken understanding. There's certainly no, I don't think there's any dispute that Mr. Kaiser and Mr. Gowdy were acquainted with one another. In fact, I think Mr. Kaiser testified at trial that at that point, which is now, I believe, some 10 to 12 years after the interview, after the events to which the interview related to 2003 to 2005, Mr. Kaiser was working for Mr. Gowdy at the resort in Mexico. So all of these aspects of reasons the appellant claims the jury should have been entitled to discredit Mr. Kaiser's testimony, that was all presented to them. And the jury made a determination as to who was telling the truth and who was not telling the truth. And they returned the verdict that they did. And Mr. Kaiser was not the only witness to tell this essentially similar story of, we didn't authorize these expenses to go to Mexico. We certainly didn't authorize the exhaustion. Is there a prosecutor on the call when these notes are being made? I don't believe so, Your Honor. The notes are the notes of Mr. Romanofsky, who I believe at the time was an investigator with another U.S. attorney's office, and an FBI agent. They're the notes of Mr. Romanofsky of that telephonic interview. I asked before if there was any effort to recall either one of them, but did the government talk to either one of them about the notes either? Not that I am aware of, Your Honor. I did not try the case. I know that neither Mr. Romanofsky nor Agent Galeota testified. What is it about the statement from the prosecutors? Mr. Kenner told you that he used that money from the central loan to get his piece of the Mexico investment with Ken Gowdy, right? That's the statement that's in the closing? Yes, Your Honor. Did Mr. Kenner say that in his testimony? I'd have to look back at the record, Your Honor. There were so many misrepresentations and outright lies, as I think the jury correctly inferred in listening to Mr. Kenner's testimony. The specific routing of how investor funds then became draws on the lines of credit, then became either payments off on other lines of credit or routing to Mexico, or payments for either or both of Mr. Constantine, the co-defendant, and Mr. Kenner's personal expenses. The exact routing of how Mr. Kenner came to obtain his interest in the Mexican resort, I don't think the jury had to decide to conclude that he had defrauded his client. Can I ask about the restitution? So there are some expenses here that go to what the investors intended, right? I mean, there is some money spent on the Hawaii investment, and there is money spent on litigation, right? So why isn't that value that goes back to the investors? There is money spent on—yes, of course, Your Honor, there are certainly investments that were put into the Hawaii project for that purpose. It's those investments that the government alleged at trial and that we think the jury's verdict demonstrates were diverted for unauthorized purposes. As for the litigation expenses, you're— So you're saying that even the investments that were spent, you think it was all unauthorized anyway, and so the investors still would be entitled to restitution. Is that right? If the agent, Mr. Kenner in this case, said, yes, I'll accept your monies to spend on this Hawaii property development, but diverts them to some other purpose— But there was money spent on the Hawaii property development, right? I believe there was some, yes, Your Honor. So I guess my question is why is that part of the restitution if that's what the investors signed up for? If it's diverted to another purpose and it's—it leads to additional losses in the forms of the lines of the credit, which are then covered by some combination of the EUFORA and the Global Settlement Fund fraud schemes, I think, Your Honor, the district court was in a good position to conclude a reasonable estimate of the losses. Well, the district court just thought actually all the gross amounts should count, right, and that it shouldn't be discounted by value that goes back to them. I don't think that's exactly correct, Your Honor. There were— Except for the disbursements from Lehman Brothers or whatever it is, right? There were disbursements from Lehman Brothers that were certainly credited back to the— and I see my time has expired, but if I may, disbursements from Lehman Brothers, I think those were something on the order of $40,000-ish to those investors that recovered. There were also disbursements. There were recoveries from— So it sounds like you agree that it should be the net amount, that legitimate expenses should be—should offset the restitution award? I think legitimate recoveries should offset the restitution reward, Your Honor, and that's why— But if he actually puts it into an investment and the investment didn't work out, that's not necessarily a misappropriation, right? Bad investment advice is no. I do not think it would be a basis for recovery. But what about the legal expenses? So if they gave money for legal expenses and money was spent on legal expenses, didn't that also go the way the investors thought it should? It may. It's a de minimis amount measured against the volume of the Global Settlement Fund, Your Honor. I think it's something like $225,000 that all parties agreed were credited against some legal funds that were in some way related to the effort to recover as against Mr. Jowdy and other alleged malfactors. But that's— But are you taking the position that the litigation, even if the investors were apprised in advance that the money was going to be spent on litigation, that nevertheless the litigation was necessitated by aspects of the fraud? No, I'm sorry, Your Honor. I may have misspoken. I meant the Global Settlement Fund in its entirety was an effort to continue to extract value from the investors and try to point the finger at others when, in fact, it was Mr. Kenner and Mr. Constantine who were extracting the investors' funds. And that some small percentage was spent on some form of litigation that was tangentially related to that doesn't unseat the vast amount of the fraud in that just one of the three schemes that were proven at trial. Sorry, let me just net that down. Was the money spent on litigation fraud? Was that part of the fraud? I know that there was approximately $200,000 or $225,000 that was connected in some way to litigation expenses. Exactly what that litigation went to achieve, I'm afraid I don't know standing here. But if it did, in fact, go to achieve what the investors wanted it to achieve, that is that they explicitly wanted that litigation to be funded, should that amount be included in the restitution? Only if the litigation was being pursued for the interests of the investors. And I think as proven at trial, the Global Settlement Fund in almost its entirety was a sort of a catch pocket for Mr. Kenner and Mr. Constantine. Isn't what you're saying now different than the argument you made in your brief? So the district court relies on just the gross amount of the investment. And in your brief you say, well, anything that went back to the investors was just to keep them from being too suspicious and to maintain the overall scheme. And so it still should be part of the restitution amount. And so it's appropriate to rely on the gross amount. But now you're sort of talking about whether, in fact, the investors got value back or not. Isn't that a different argument? No, I apologize, Your Honor. I think the point I'm articulating is that the Global Settlement Fund in its entirety was just another effort to defraud the investors. So you're saying that actually the legal – the amount spent on litigation was not really spent the way the investors intended it to be. But if it were, that should be deducted from the restitution amount. So it all depends on the facts of that question. It sort of makes me think of the old saw about the calls coming from inside the house. It's Mr. Kenner and Mr. Constantine that are allegedly directing the fund and controlling where the funds are being spent. And in its entirety, they're not being spent for the benefit of the investors. So if they are pursuing a litigation, they should really be pursuing themselves for having extracted the value they did from EFORA and particularly what Mr. Kenner extracted. I was expecting you to say something else, which is that two things could simultaneously be true, which are, A, the money is diverted from its – Then Mr. Jowdy squanders this money on the Mexico project in one or more ways and your defendants go back to the investors and say, Look, we have a valid claim against this Jowdy guy because he squandered the money. You know, fund the litigation fund and we'll go sue them. It could be true that the investors are apprised of what's going to happen with the litigation fund, but that the litigation fund would never have been necessitated in the first place absent the fraud. Is that – are you saying that or are you not saying that? I think that's a better way of expressing what I'm trying to say, Your Honors, that they would not have invested in the global settlement fund at all, much as they would not have purchased stock in EFORA at all had they been given sufficient knowledge. Okay, thank you very much, Mr. Higgins. We'll turn it back to Mr. Brissenden on the rebuttal. Thank you, Your Honor. Just briefly, I wanted to clarify the record in response to a question that had been asked. So to be crystal clear, at trial, Mr. Kaiser never testifies or acknowledges that he discussed the loans with Jowdy before or after the fact. His testimony at trial is very clear. He testifies that the first time he learns of the loans, it's after the fact and it's through Kenner. He claims that's where his knowledge comes. And that is a central allegation. One of the key allegations of it is that this fact was hidden from Kaiser and the other investments. So his prior statement to the government is diametrically opposed to what his testimony was. Ani, with respect to a key and central allegation. I'm trying to respond to the arguments – to the government's argument that his testimony was essentially similar to the testimony of the other witnesses. Well, the other witnesses – Kaiser wasn't the only one that had inconsistencies in this regard. There were at least two other witnesses who had previously stated on sworn testimony that they were aware of the Mexican loans before they get to trial and now say they were never aware or apprised of the Mexican loans. So there were real problems with that aspect of the government's case. The government harps on its mantra, as it does on every appeal, overwhelming evidence, overwhelming evidence. There were nine counts of this case. Mr. Kenner is acquitted of three of them. The government failed to prove at least a third of its case, which doesn't strike me as an example of overwhelming evidence. At the end of the day, the government stood up here.  They knew it was a problem at the trial, which is exactly why these remarks about – But there was a prosecutor on the phone when the notes were being taken. You don't dispute that, do you? They were taken on the phone. I will say – and I think it was a little unclear – there were two persons present. One was an investigator at the Southern District's office. The other was the lead FBI agent, Agent Galeado, who during the trial was sitting next to the prosecutor. Your argument is the prosecutors suborned perjury here and tolerated perjury. Maybe they didn't suborn it, but they let it stand. Do you have any case in which prosecutors get tagged with letting perjury stand where they don't have any more basis to conclude that this is perjury than you do? You're just saying they should have drawn the same inference from the notes that you're drawing. But there's no allegation that they had some special knowledge. Well, they have, number one, the notes, which I think we are all struggling to reconcile with the witness's testimony. Number two, they're sitting at the table with the agent who listened to the statement. But what's the best case for you on the government tolerating perjury where that conclusion comes only from inference? Well, I would argue it's more than inference because the statement is made to one of the government's agents, right? I mean, again, he's sitting there at the table. This case is similar to United States v. Jenkins, a case from this court. Again, Jenkins, like Napoo and Giglio, relates to the existence of an understanding with the prosecutor. But you have a situation where the witness lies about what happened in it. It's impeachment evidence in all these cases. He lies about material impeachment evidence. Government fails to correct it and then stands up and endorses it, which is exactly what happened in Jenkins in summation. It's a very similar pattern, and I think it's on all fours with those cases. I do also want to clarify because the question was asked. Mr. Kenner, and I would invite the court to look at the testimony, he never testified that he obtained his 39 percent stake in this resort through using the Hawaiian funds. He testified to precisely the opposite. And what is so troubling is that it comes out during the four fixture hearings that the government had every reason to know that. Aside from what Mr. Kenner testified to, they had interviewed Mr. Joudy, his 3,500 material, and his interviews reflect exactly the same. He told the government the same thing, that the funds for that 39 percent came from a different source. So in both of these cases, you have the government in rebuttal coming very close to the edge, arguing inferences they know, either know or should know or are unsure of. Okay. Thank you very much. Thank you. Mr. Grissomden, the case is submitted.